THYBERGLAW
GREGORY A. THYBERG SBN102132
3104 O STREET, #190
SACRAMENTO, CALIFORNIA 95816
TEL: (916) 204-9173
greg@thyberglaw.com

ATTORNEYS FOR PLAINTIFF, MEUY SAETERN



FILED
May 09, 2023
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

SEALED

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA: *ex rel.* MEUY SAETERN,<br><br>Plaintiffs,<br><br>vs.<br><br>DIGNITY HEALTH, a corporation, DIGNITY HEALTH MEDICAL FOUNDATION, a corporation, KAMRAN SAHRAKAR, M.D., an individual, YI-REN CHEN, M.D., an individual, and JOSHUA LUCAS, M.D., an individual.<br><br>Defendants | Civil Action No. 2:23-cv-0863 JDP<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

**FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL**

**I. INTRODUCTION**

1. Meuy Saetern ("SAETERN"), the "relator", brings this action on behalf of the United States of America against defendants Dignity Health ("DIGNITY"), Dignity Health Medical Foundation ("DHMF"), Kamran Sahrakar, M.D. ("SAHRAKAR"), Yi-Ren Chen, M.D. ("CHEN") and Joshua Lucas, M.D., ("LUCAS") for treble damages and civil penalties arising from defendants' false statements and false claims in violation of

FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL   1

the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq*. The violations arise out of fraudulently billing Medicare for services that were rendered in violation of the Stark Act, 42 U.S.C. § 1395nn and the Anti-kickback Statute, 42 U.S.C. § 1320a–7b(b). Defendants also billed Medicare for surgeries that were not medically necessary in violation of 42 U.S.C. § 1395f (a & y) and 42 C.F.R. 424.10(a)

2. As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), the relator has provided to the Attorney General of the United States and to the United States Attorney for the Eastern District of California a statement of all material evidence and information related to the complaint current with the filing of this action. This disclosure statement is supported by material evidence known to the relator at her filing establishing the existence of defendants' false claims. Because the statement includes attorney-client communications and work product of relator's attorneys, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the relator understands this disclosure to be confidential.

## II. JURISDICTION AND VENUE

3. This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

4. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the acts proscribed by 31 U.S.C. §§ 3729 *et seq*. and complained of herein took place in this district, and is also proper pursuant to 28 U.S.C. § 1391(b) and (c), because at all times material and relevant, defendants transact and have transacted business in this District.

**FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL**     2

## III. THE PARTIES

5. Relator SAETERN is a citizen of the United States and a resident of the State of California. SAETERN started working for DIGNITY in December 2016.

6. From June 2021 to March 2023, relator worked as the Neuroscience & Spine Coordinator in the Spine Program at Mercy San Juan Medical Center also known as Mercy San Juan Hospital ("MSJH") which is owned by DIGNITY. The relator brings this action based on her direct, independent, and personal knowledge and also on information and belief.

7. As Neuroscience & Spine Coordinator, relator gained first-hand knowledge regarding DIGNITY'S referrals of spine surgery patients directly to SAHRAKAR at DHMF for a consultation, who in return would schedule these patients for spine surgery at MSJH.

8. SAETERN was also directly involved in requesting doctors to fill out the medical attestation forms that MSJH was required to maintain to document that a spine surgery was medically necessary in order to bill Medicare for those surgeries. Based on her review of the medical attestation forms required by her job, relator has personal knowledge that MSJH hospital was performing spine surgeries that did not have the supporting documents required to establish those surgeries were medically necessary as required by Medicare regulations.

9. Defendant, DIGNITY is a California-based not-for-profit public-benefit corporation that operates hospitals and ancillary care facilities in three states. DIGNITY

was the fifth-largest hospital system in the nation and the largest not-for-profit hospital provider in California. DIGNITY is owned by Common Spirit Health ("CSH"), the largest Catholic health system, and the second-largest nonprofit hospital chain, in the United States. CSH operates more than 700 care sites and 142 hospitals in 21 states. DIGNITY owns and operates MSJH.

10. Defendant, DHMF, established in 1990, is a not-for-profit organization public benefit corporation with medical groups located throughout California, that employ physicians to offer primary care teams and specialists and is affiliated with DIGNITY. One of DHMF'S medical groups is Mercy Medical Group in Carmichael where defendants, SAHRAKAR, CHEN and LUCAS practiced.

11. Defendant, SAHRAKAR an individual and on information and belief is a citizen of the United States and a resident of the State of California. SAHRAKAR at all times alleged in this complaint was a licensed physician in the State of California and a neurosurgeon practicing with DHMF Medical Group in Carmichael, California.

12. Defendant, CHEN is an individual and on information and belief is a citizen of the United States and a resident of the State of California. CHEN at all times alleged in this complaint was a licensed physician in the State of California and a neurosurgeon practicing with DHMF Medical Group in Carmichael, California.

13. Defendant, LUCAS is an individual and on information and belief is a citizen of the United States and a resident of the State of California. LUCAS at all times alleged in this complaint was a licensed physician in the State of California and a neurosurgeon practicing with DHMF Medical Group in Carmichael, California.

## IV. STATUTORY AND REGULATORY BACKGROUND

### A. The Medicare Program

14. The United States, through the Department of Health and Human Services ("HHS"), administers the Hospital Insurance Program for the Aged and Disabled established by Part A ("Medicare Part A Program"), the Supplementary Medical Insurance Program established by Part B ("Medicare Part B Program"), and the Voluntary Prescription Drug Benefit Program ("Medicare Part D Program"), Title XVIII, of the Social Security Act under 42 U.S.C. §§ 1395 *et seq.*

15. The Medicare Part A, Medicare Part B, and Medicare Part D programs are federally financed health insurance systems for persons who are aged 65 and over and those who are disabled. HHS has delegated the administration of the Medicare Program to the Health Care Financing Administration ("HCFA"), a component of HHS. Another component of HHS, the Office of Inspector General ("OIG") is responsible for investigating Medicare fraud and abuse, as well as issuing regulations and instructions that implement the Medicare and Medicaid fraud and abuse authorities.

16. The Medicare Part A program covers all inpatient hospital services provided to eligible persons, known as Medicare beneficiaries. In addition, the Part A program covers certain home health services provided to Medicare beneficiaries who do not have Part B coverage.

17. The Medicare Part B Program provides coverage for a wide range of outpatient services, for physician and diagnostic services, for home health services for Part B eligible persons and for durable medical equipment.

18. The Medicare Part D program covers qualifying prescription drugs for those who qualify for service under Medicare Parts A or B.

19. Medicare makes payments under Parts A, B, and D using private companies and insurance companies ("contractors") who provide these services under a contract with HCFA. These companies pay Medicare claims and determine the amount of reimbursable costs based on coverage and reimbursement policies established by HCFA.

20. Medicare pays for medical treatment based on a fee schedule. The Centers for Medicare and Medicaid Services ("CMS"), an agency within HHS, uses a comprehensive coverage determination process to determine which treatment qualifies for coverage.

**B. The Stark Act**

21. Congress passed the Stark Act in 1989 to address the inherent conflict of interest that exists when a physician has a financial relationship with a hospital to which they are referring a patient for services paid for by the federal government. The Stark Act codified in, 42 U.S.C. § 1395nn ("Stark Act") "prohibits doctors from referring Medicare patients to a hospital if those doctors have certain specified types of 'financial relationships' with that hospital" and "prohibits that same hospital from presenting claims for payment to Medicare for any medical services it rendered to such patients." *United States ex rel. Mastej v. Health Mgmt. Assocs.,* 591 Fed. Appx. 693, 698 (11th Cir.2014) (Hull, J.).

22. A "financial relationship," as defined by Section 1395nn(a)(2)(B), is a "compensation arrangement" between a physician and a hospital. Under the regulations implementing the Stark Act, a "compensation arrangement" is "any arrangement involving any remuneration," and "remuneration" is "any payment or benefit, made

directly or indirectly, overtly or covertly, in cash or in kind." 42 C.F.R. §§ 411.351, 411.354(c).

23. The Stark Act prohibits forms of direct and indirect compensation arrangements. A direct compensation arrangement "exists if remuneration passes between the referring physician ... and the [hospital] without any intervening persons or entities." 42 C.F.R. § 411.354(c)(1). An indirect compensation arrangement exists if (1) remuneration passes through an "unbroken chain" between the referring physician and the hospital; (2) the "referring physician ... receives aggregate compensation ... that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the [hospital];" and (3) the hospital "has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician ... receives [the described] aggregate compensation." 42 C.F.R. § 411.354(c)(2).

24. The Stark Act prohibits a hospital or medical provider from presenting or causing to be presented a Medicare claim for services furnished pursuant to a prohibited referral. 42 U.S.C.A. § 1395nn(a)(1)(B), *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901–02 (5th Cir. 1997)

C. Anti-kickback Statute

25. A hospital's violation of the Stark Act also constitutes a violation of the Anti-kickback Statute, 42 U.S.C. § 1320a–7b(b). The Anti-kickback Statute provides that a hospital commits a felony by financially inducing a physician to refer a Medicare patient. Specifically, 42 U.S.C. § 1320a–7b(b)(2) prohibits "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or

indirectly, overtly or covertly, in cash or in kind to any person to induce such person ... to refer an individual to a person [for medical services] for which payment may be made in whole or in part under a federal health care program. The exceptions to the Anti-kickback Statute closely parallel the exceptions to the Stark Act. *See* 42 C.F.R. § 1001.952(b)

26. In submitting the CMS Health Insurance Claim Form 1500 to bill Medicare for their services physicians certify they have complied with all Medicare laws and regulations including the Anti-Kickback Statue.

### D. Medicare Medical Necessity

27. Hospitals and medical providers may not bill Medicare for services that are not medically necessary.

28. 42 U.S.C. § 1395y limits Medicare payments to services that are reasonable and necessary as the statute provides: "Notwithstanding any other provision of this subchapter, **no payment may be made under part A or part B for any expenses incurred for items or services--**(1)(A) which, except for items and services described in a succeeding subparagraph or additional preventive services (as described in section 1395x(ddd)(1) of this title), **are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.** (Emphasis added)

29. Physicians and medical providers who seek reimbursement under the Medicare Act must "certify the *necessity* of the services and, in some instances, recertify the continued need for those services." 42 C.F.R. 424.10(a) (Oct. 1, 2013) (Emphasis added); *see also* 42 U.S.C. §§ 1395f(a).

30. To meet the reasonable and necessary (R&N) threshold for coverage of a procedure, the physician's documentation for the case should clearly support both the

**FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL**   8

diagnostic criteria for the indication (standard test results and/or clinical findings as applicable) and the medical need (the procedure does not exceed the medical need and is at least as beneficial as existing alternatives & the procedure is furnished with accepted standards of medical practice in a setting appropriate for the patient's medical needs and condition.

31. All providers who report services for Medicare payment must fully understand and follow all existing laws, regulations and rules for Medicare payment for Lumbar Spinal Fusion for Instability and Degenerative Disc Conditions and must properly submit only valid claims for them.

32. The Centers for Medicare & Medicaid Services (CMS), is a federal agency within HHS that administers Medicare and sets the national coverage policy.

33. Medical providers are advised by the CMS.Gov website that they must review, understand and apply the medical necessity provisions as set forth in the relevant CMS manual instructions and policies published on the CMS.Gov website.

34. According to the CMS.Gov Medical Coverage Data Base for Lumbar Spinal Fusion for Instability and Degenerative Disc Conditions ("CMS.Gov Spine") spine surgery is only appropriate as medically necessary after conservative non-surgical treatments have been exhausted. CMS requires that conservative therapy (non-surgical medical management) be used for at least 3 to 12 months, depending on the diagnosis, before lumbar fusion surgery is considered.

35. CMS.Gov website requires that physicians and hospitals document that a spine surgery is medically necessary and that the hospital maintain those records in the event CMS decides to conduct an audit as to whether the hospital and medical providers have billed the government for surgeries that meet the Medicare medical necessity standard.

**FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL**     9

36. CMS.Gov states: "To meet the reasonable and necessary (R&N) threshold for coverage of a procedure, the physician's documentation for the case should clearly support both the diagnostic criteria for the indication (standard test results and/or clinical findings as applicable) and the medical need (the procedure does not exceed the medical need and is at least as beneficial as existing alternatives & the procedure is furnished with accepted standards of medical practice in a setting appropriate for the patient's medical needs and condition)."

37. CMS.Gov places responsibility on the hospital to maintain the records that document that a spine surgery is medically necessary as the CMS website states: "The hospital records are the primary source of information for the audit of hospital/procedure services. Therefore, any historical data supporting the medical necessity for the fusion (for example, duration and outcomes of physiotherapy, injection therapy, anatomic factors influencing the decision for surgery, etc.) must be included in the inpatient medical record as noted in the history and physical examination, operative note and/or copies of office notes.

38. In submitting the CMS Health Insurance Claim Form 1500 to bill Medicare for their services, physicians certify they have complied with all Medicare laws and regulations and that their services were "medically necessary."

39. Hospitals are also required to submit an annual cost report on CMS Form 2552-10 certifying that the services rendered were in compliance with all Medicare laws and regulations.

### V. WRONGFUL CONDUCT OF DEFENDANTS

**A. Violation of Stark Act and Anti-kickback Statute**

40. Defendants engaged in a reciprocal referral arrangement that violated the Stark Act.

**FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL**   10

41. When the Spine Program at MSJH received an inquiry about a patient potentially needing spine surgery, the Spine Program referred those patients directly to SAHRAKAR at DHMF'S Mercy Medical Group for a surgery consultation rather than using DIGNITY'S normal referral process where DIGNITY'S referral coordinator would provide the patient with a list of qualified neurosurgeons to choose from.

42. SAKRAKAR would evaluate the patient and refer them back to MSJH for spine surgery. The surgeries were performed by Mercy Medical Group doctors, CHEN and LUCAS, with SAHRAKAR often assisting in the surgery.

43. These direct referrals created a financial relationship between DHMF, SAKRAKAR, CHEN, LUCAS and DIGNITY that violated the Stark Act. The Stark Statute states an illegal: "financial relationship,' as defined by 1395nn(a)(2)(B), is a 'compensation arrangement' between a physician and a hospital. Under the regulations implementing the Stark Statute, a "compensation arrangement" is "any arrangement involving any remuneration," and "remuneration" is "any payment or benefit, made directly or indirectly, overtly or covertly, in cash or in kind." 42 C.F.R. §§ 411.351, 411.354(c).

44. The exclusive stream of direct referrals to doctors SAHRAKAR, CHEN and LUCAS at DHMF gave them a financial incentive to refer patients to MSJH hospital for spine surgery.

45. Relator observed that SAHRAKAR and his DHMF partners CHEN and LUCAS were performing approximately six spine surgeries per week at MSJH that were paid for by Medicare at a cost of approximately $200,000 each. These surgeries occurred from June 2021 until the beginning of 2023.

46. Relator is informed and believes based on statements made to her by her manager that these illegally referred Medicare surgeries were occurring since the Spine Program was established in 2017.

47. From the beginning of her employment at the Spine Program in June 2021, relator noticed that SAHRAKAR, a neurosurgeon, was very involved in the Spine Program even though he was not an employee of the MSJH.

48. The Spine Program held monthly meetings which relator attended where they discussed hospital financial issues, how to increase profits and how the hospital could improve patient care.

49. SAHRAKAR attended these monthly Spine Program meetings even though he had no official position that required he attend these meetings and no other neurosurgeon was ever in attendance, including the chief neurosurgeon, Dr. Babbitz ("BABBITZ").

50. When relator worked at Mercy Medical Group in Sacramento patient referrals went through DIGNITY'S referral coordinator who would provide patients with a list of doctors to choose from.

51. When relator started working for the Spine Program, the program manager, Michelle Arroyo ("ARROYO") told relator that when she was contacted by the emergency department or someone else about spine surgery, she was supposed to bypass the normal DIGNITY referral coordinator and was instructed to refer patients directly to SAHRAKAR at DHMF'S Mercy Medical Group. Relator was told to call Claudia, the front office representative, at Mercy Medical Group.

52. Relator told ARROYO she did not think it was legal to make a direct referral to SAHRAKAR, and ARROYO responded but there is nothing she can do because that is what is expected from her.

53. Relator noticed that the patients she was referring to SAHRAKAR were being referred back to MSJH for spine surgeries that were performed by neurosurgeons CHEN and LUCAS who were partners with SAHRAKAR at Mercy Medical Group with SAHRAKAR occasionally assisting in the surgeries.

54. Relator also informed her director, Anu Locricchio ("ANU"), that she did not think it was legal to be referring patients directly to SAHRAKAR.

55. In July of 2022, relator advised the new Spine Program manager Kristin Mueller ("MUELLER") that the direct referrals of patients to SAHRAKAR was a violation of the Stark Act.

56. MUELLER acknowledged that BABBITZ had complained that SAHRAKAR has been stealing his patients for many years. After raising his issue with MUELLER, relator was excluded from the monthly Spine Program meetings.

B. **Medicare Spine Surgeries That Were Not Medically Necessary.**

57. Defendants billed Medicare for spine surgeries that were not medically necessary and/or did not properly document medical necessity as required for Medicare payment.

58. The Spine Program was set up to track patient care so that the DIGNITY'S Neurological Institute at MSJH could receive the highest rating from The Joint Commission ("THC"), an organization that that accredits hospitals, for performing spine surgeries.

59. Relator's role involved scheduling spine surgeries and tracking patient outcomes.

60. Relator would access an electronic medical record program, SurgiNet, which tracks patient perioperative information. "Perioperative" information includes a surgical patient's preoperative, intraoperative and postoperative information.

61. Relator was required to access SurgiNet and filter neurosurgeon providers for four types of procedures, spinal fusion, laminectomy, discectomy and intervertebral disc arthroplasty.

62. Relator was required to filter and identify patients who had straight Medicare primary insurance who were scheduled to have lumbar or thoracic fusion surgeries.

63. Relator would transfer the Medicare patients to a google sheets template where they were tracked to make sure the medical attestation information required for Medicare billing was complete in the event of an audit was conducted.

64. Medicare attestations were required to be sent to the hospital three days before a Medicare patient's scheduled spine surgery.

65. The Medicare attestation form was used to document the patient's medical history in order to document that a spine surgery met the medical necessity requirements in order to bill Medicare for a spine surgery. These medical attestation forms were sent the patient registration representative at Mercy General Hospital ("MGH") and in the case of MSJH the forms were sent to the pre-admitting nurses.

66. Relator's job was to reach out to the surgery scheduler and make sure that spine surgeon had returned the signed medical attestation form. The medical attestation required not only the signature of the doctor but also required supporting documentation to support the information the surgeon placed on the form. For example, if the surgeon's noted the patient had received physical therapy the medical attestation required that the physical therapy notes be included.

67. The medical attestation form required that the physician include information to substantiate that a spine surgery was reasonable and medically necessary as required by Medicare billing requirements.

68. For example, before billing Medicare for a lower back fusion the medical provider was required document that the patient had experienced lower back pain for at least three months and that alternate conservative medical treatments such as physical therapy or injections had been exhausted before electing surgery.

69. MSJH was required to maintain the information in the medical attestation packet to document that a spine surgery they billed to Medicare was reasonable and medically necessary in the event MSJH was audited by CMS.

70. Relator noted multiple Medicare spine surgeries were being performed every week where the medical attestation requirements were not being complied with.

71. In her position tracking spine surgeries performed at MSJH, relator noticed a pattern of replacing private pay patients with Medicare patients when a private patient surgery cancelled at the last minute.

72. MSJH would fill their cancellations with Medicare pay patients because Medicare did not require the same authorization process as private insurance patients. Authorization for a private insurance patient could take 30 days whereas Medicare did not require pre approval. Relator noticed that most of these Medicare patient's surgeries did not qualify as "medically necessary" procedures for Medicare payment, as the medical attestation forms lacked the information needed to document the Medicare "medical necessity" requirements had been met.

73. After relator complained about defendants' failure to properly document "medical necessity" for their Medicare spine surgeries, she noticed a sharp decline in the number of surgeries performed. Medicare spine surgeries dropped from approximately six per week to two per week.

**Count I**
*Presentation of a False or Fraudulent Claim 31 U.S.C. §3729(a)(1)(A)*

74. Relator re-alleges and incorporates the allegations of paragraphs 1–73 as if fully set forth herein.

75. Defendants knowingly falsely presented or caused to be presented for payment or approval a claim that is false or fraudulent.

76. Defendants falsely certified they were complying with all Medicare laws and regulations in performing services for which they were submitting claims for payment when they had violated the Stark Act and the Anti-Kickback Statute. This was done to get false or fraudulent claims paid by the U.S. government under Medicare.

77. Defendants also falsely certified that spine surgeries they were billing Medicare for were medically necessary and complied with Medicare laws and regulations when they did not. This was done to get false or fraudulent claims paid by the U.S. government under Medicare.

78. Defendants made these misrepresentations to obtain payment funds to which they would otherwise not have been entitled.

79. This course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq*.

80. The U.S. Government, unaware of the falsity of the claims and/or statements, and in reliance on the accuracy thereof, was damaged to the extent that these funds paid to defendants for these spine surgeries.

### Count II
*Use of a False or Fraudulent Statement or Record 31 U.S.C. §3729(a)(1)(B)*

81. Relator re-alleges and incorporates the allegations of paragraphs 1–80 as if fully set forth herein.

82. Defendants knowingly made, used, or verified a false record or statement that was material to the false or fraudulent claim.

83. Defendants used fraudulent statements including CMS Forms 1500, 2552-10 and billing records to get the U.S. government to pay for surgeries that were not medically necessary and performed in violation of the Stark Statute and Anti-Kickback Statute.

84. This course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq*.

85. The U.S. Government, unaware of the falsity of the claims and/or statements, and in reliance on the accuracy thereof, was damaged to the extent that these funds paid for the treatment.

### Count III
*Failure to Reimburse Money Wrongfully Paid and Owed 31 U.S.C. §3729(a)(1)(G)*

86. Relator re-alleges and incorporates the allegations of paragraphs 1-85 as if fully set forth herein.

87. Through the acts described above, Defendants knowingly made, used or caused to be made or used a false record or statement that is material to an obligation to pay or transmit money or property to the government.

88. Defendants also knowingly concealed or knowingly or improperly avoided or decreased an obligation to pay or transmit money or property to the United States. This was all in violation of 31 U.S.C.A. §3729(a)(1)(G).

89. As a result of these "reverse" false claims, the United States has been damages and continues to be damaged in an amount yet to be determined.

### Count IV
*Conspiracy to Submit False Claims 31 U.S.C §3729(a)(1)(C)*

**FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL**   17

90. Relator re-alleges and incorporates the allegations of paragraphs 1–89 as if fully set forth herein.

91. Defendants combined, conspired, and agreed together to defraud the United States by knowingly submitting false claims to the United States and to its grantees for the purpose of getting the false or fraudulent claims paid or allowed and committed the other overt acts set forth above in furtherance of that conspiracy, all in violation of 31 U.S.C. § 3729(a)(1)(C), causing damage to the United States.

WHEREFORE, relator respectfully requests this Court to enter judgment against defendants, as follows:

(a) That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq*. provides;

(b) That civil penalties, as allowed by law, be imposed for each and every false claim that defendant presented to the U.S. and/or its grantees;

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the relator necessarily incurred in bringing and pressing this case;

(d) That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this Complaint;

(e) That the relator be awarded the maximum amount allowed to her pursuant the False Claims Act; and

**FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL**  18

(f) That this Court award such other and further relief as it deems proper.

**DEMAND FOR JURY TRIAL**

Relator, on behalf of herself and the United States, demands a jury trial on all claims alleged herein.

DATED: May 8, 2023                                              THYBERGLAW

  /s/ *Gregory A. Thyberg*
GREGORY A. THYBERG
Attorneys for Plaintiff
MEUY SAETERN